(155 App. Div. 171.)

CHINA & JAPAN TRADING CO., Limited, v. PROVAND.

(Supreme Court, Appellate Division, First Department. February 7, 1913.)

ACCOUNT (§ 7*)—RIGHT TO AN ACCOUNTING.

Where two mercantile companies entered into a contract purposed to enable one to discontinue its Manchester, England, establishment and the other its Shanghai, China, establishment, which contract created mutual obligation for the advancement of moneys and rendition of services, each party taking the risk of their respective ventures being profitable and having the right to participate in the net profits, if any, and each being required to account to the other for moneys received and disbursed and to keep accounts thereof, open to the inspection of the other, one party was entitled to an accounting with respect to secret profits fraudulently obtained and retained by the other, regardless of whether the relationship between them constituted a copartnership, a joint adventure, or a fiduciary relation involving trust and confidence.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 20, 21; Dec. Dig. § 7.*]

Scott, J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, New York County.

Action by the China & Japan Trading Company, Limited, against Andrew D. Provand. From an interlocutory judgment sustaining a demurrer to the complaint, plaintiff appeals. Reversed, and demurrer overruled.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

William S. Maddox, of New York City, for appellant.
Charles C. Nadal, of New York City, for respondent.

LAUGHLIN, J. The plaintiff is a domestic corporation engaged in buying and selling cotton piece goods, and it maintained a branch office and selling agency in Shanghai, China. The defendant was a resident of Manchester, England, and conducted a like business under the name of "A. Provand & Co." Shortly prior to the 27th day of April, 1882, the plaintiff was about to establish an office or agency in London for the purchase of cotton goods for sale in China and Japan, and on the day last mentioned the plaintiff and defendant entered into an agreement in writing, reciting these facts and setting forth that the object of the agreement was to enable the parties "to do the business on mutually advantageous terms," and to enable the plaintiff "to buy Manchester goods on best terms, with charges at actual cost," and to enable the defendant to consign goods to the plaintiff for sale in China and Japan on his account "at a minimum expense, the charges at Shanghai being also actual." It was further expressly recited in the agreement that thereby the plaintiff would be enabled to save "commission and expenses in London," and the defendant would save "the expense of maintaining an establishment in the port of Shanghai." It was further provided that the defendant should close the house, or agency, which he had theretofore maintained in Shanghai, and would do no business in that territory in this line of goods, excepting through the plaintiff, and that the plaintiff was to do no business "in Manchester piece goods," excepting with the defendant or with his consent. It was further provided that all purchases by the defendant for the plaintiff were to be "after mutual consultation and agreement as to quantity, quality, kind, and price." It was expressly provided in the agreement that all purchases made by the defendant, whether on his own account, or for the plaintiff, would be made on the "customary Manchester terms," which were specified to be that payments for the goods would be made on "regular pay days which occur within three to seven days from delivery" of the goods at the defendant's warehouse "to be made up and packed," and that the defendant would "invoice the goods at the price or prices paid, less the actual discount allowed by the seller and free of any commission." A schedule of packing charges was set forth in the agreement, which it was recited in the agreement were to be "the agreed packing charges to be entered in the invoices."

According to the allegations of the complaint, the parties entered upon the performance of the agreement and continued business thereunder until the 5th day of March, 1901, when they made a new con-

tract, the provisions of which in some respects differ from the first contract, and in which, among other things, it was expressly provided, as had been provided in substance in the original contract, that the packing charges should include inspecting, ticketing, stamping, stitching, packing, warehouse rent, fire insurance, and all other items usually known as "packing charges." The new contract provided that packing charges "will be entered in the invoices on the following basis, subject to readjustment from time to time, as may be necessary, according to cost of materials," following which was a schedule of such charges. It was further provided that the plaintiff should forward all goods, whether shipped on its own account or on the account of the defendant, and that "freight returns" received should be divided between them in proportion to the business of each party. The agreement further provided that, when the goods were shipped and the invoices prepared, the defendant should draw on the plaintiff through an Eastern bank "at two or three months after sight, as may be most advantageous," with invoices, bills of lading, and policy of insurance attached to the draft, and the plaintiff was to accept the draft on presentation, and when the goods arrived at Shanghai they were to be stored by the plaintiff "at current rates." It was further provided that the plaintiff should receive interest "at the current rate" on all moneys advanced by it, and should receive five-tenths of the net profit on goods sold for the account of the defendant "as their commission for selling and doing the work at Shanghai," and that with respect to goods on which no profit was made the plaintiff was to receive no commission, and that with respect to goods purchased for the account of the plaintiff the defendant was to be paid three-tenths "of the net profit for purchasing the goods and doing the work at Manchester, but, if no profit is made, then" the defendant was not to be paid any commission for purchasing. It was further provided that, with respect to all goods shipped by the defendant on consignment for other firms, the commission charged by the plaintiff was to be equally divided with the defendant. It was recited in the agreement that advances would have to be made to the consignors on goods to be shipped to Shanghai for sale on account, and that there might be losses thereon and a deficit, and for that reason the defendant undertook to be responsible for the amount of such deficit, "should the consignor become insolvent and unable to make deficit good," and that the defendant would receive his consideration therefor "from the consignors by commission or extra charges for packing." By the final paragraph of the agreement, it was provided that the books of either party should be open to the other for audit by an approved public accountant, "should either party require proof that charges for goods bought, or returns for goods sold, were made in accordance with the terms of this agreement."

On the 19th of April, 1907, the parties executed a "supplement" to their agreement of March 5, 1901, and it was therein provided that after July 1, 1907, bills of lading and policies of insurance on goods bought and shipped for the account of the plaintiff should be forwarded to the plaintiff's London office, and that the plaintiff would thereupon pay for the goods in cash; and it was evidently, at that

time, contemplated that the business should be conducted on a commission basis, for the commissions to be charged by the defendant were limited by a maximum figure, and the invoices were to be made out "at a round price per piece, which will include cost, freight, insurance, packing, cabling, and commission," and the packing charges were increased a specific amount after the 1st day of April, 1907. It appears that by a letter under date of October 4, 1907, the plaintiff represented to the defendant that the supplemental agreement had not proved to be satisfactory, and suggested certain changes, which the plaintiff alleges were made.

The plaintiff, by its complaint, characterizes the business relations between it and the defendant under these agreements as a "joint adventure or copartnership." The plaintiff alleges that, after commencing business under the first agreement, the business relations of the parties were continued under the successive agreements until the 15th day of January, 1908, when they were terminated. The plaintiff further alleges that the defendant represented to it that the actual cost of packing charges to be paid and disbursed by the defendant was as specified in the schedules in the agreements, and that the plaintiff relied upon such representations, and in reliance thereon paid the packing charges to the defendant on the basis of the figures set forth in the agreements, but that shortly before the commencement of this action it discovered that the actual amounts paid by the defendant for packing charges were much less than the amounts charged in the statements rendered by the defendant to the plaintiff, according to which the plaintiff settled with the defendant, and were also much less than the prices set forth in the schedules in the agreements, and that, in order to deceive the plaintiff with respect thereto, the defendant in the first instance advanced the full amount for packing charges as charged to the plaintiff, but thereafter secretly received rebates and allowances and returns from the packers to an amount and extent which the plaintiff believes to exceed the sum of $25,000. It thus appears that the plaintiff distinctly alleges two grievances: First, that the defendant misrepresented the fact that the figures specified in the schedules in the agreements represented the actual cost; and, second, that the statements from time to time rendered by the defendant to the plaintiff, and upon which the plaintiff made advances and settlements, represented the actual cost of packing charges.

A question arises, with respect to the first ground of complaint, as to whether plaintiff would not be obliged to have the agreement reformed or rescinded before it would be entitled to relief; but I am of opinion that the parties contemplated that neither was to receive any profit out of the business transactions embraced within the contracts, excepting the specified proportion of the net profits. That stands out quite clearly in the original agreement, which provided that all charges were to be at actual cost; and it is made particularly clear by the agreement of March 5, 1901, wherein it is expressly provided that the packing charges as entered upon the invoices pursuant to that agreement would be "subject to readjustment from time to time, as may be necessary, according to cost of materials," and that each is entitled to an inspection of the books kept by the other.

It is contended that the plaintiff was only interested in the profits on the goods which it shipped and sold for the account of the defendant as compensation for its services, and that the defendant was only interested in like manner in the profits on goods purchased by him for the plaintiff, which would not constitute the parties copartners, and would not entitle either to an accounting. Cassidy v. Hall, 97 N. Y. 159; Larzelere v. Taber, 119 App. Div. 81, 103 N. Y. Supp. 970; Marvin v. Brooks, 94 N. Y. 71; Conger v. Judson, 69 App. Div. 121, 74 N. Y. Supp. 504. That is not the proper construction of the contracts. There was a mutual obligation for the advancement of moneys and for the rendition of services, each party taking the risk of the respective ventures being profitable and having the right to participate in the *net profits* as such, if any were realized, and each being required to render to the other correct accounts of moneys received and disbursed and to keep accounts thereof, to be open to the inspection of the other party. It is not necessary that we should now decide whether the relationship thus constituted was that of copartners, joint adventurers, or agency of a fiduciary relation involving trust and confidence; for any one of those relationships would entitle the plaintiff to an accounting with respect to secret profits thus obtained and retained. Hacket v. Stanley, 115 N. Y. 629, 22 N. E. 745; Marston v. Gould, 69 N. Y. 225; Farr v. Morrill, 53 Hun, 31, 5 N. Y. Supp. 720; Marvin v. Brooks, supra; Spears v. Willia, 151 N. Y. 443, 45 N. E. 849; Watts v. Adler, 130 N. Y. 648, 29 N. E. 131; Lord v. Hull, 178 N. Y. 14, 70 N. E. 69, 102 Am. St. Rep. 484; Schantz v. Oakman, 163 N. Y. 148, 57 N. E. 288; Underhill v. Jones, 72 App. Div. 71, 76 N. Y. Supp. 266; and 2 Lindley on Partnership, star pp. 303–305, 495, 496. I am of opinion, therefore, that the demurrer, which was based upon the ground that the complaint fails to state facts sufficient to constitute a cause of action, should have been overruled.

It follows that the interlocutory judgment should be reversed, with costs, and the demurrer overruled, with costs, with leave to defendant to withdraw the demurrer and plead over, on payment of costs of the appeal and of the demurrer.

INGRAHAM, P. J., and McLAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. (dissenting). In my opinion the plaintiff cannot maintain an action for the alleged excess of packing charges collected, over the actual charges paid, until the several contracts between the parties have been reformed, and this plaintiff does not ask for. Each contract definitely fixed the rates of packing charges to be allowed, and these have not been exceeded. If false representations were made as to the actual cost, there might be ground for reformation; but so long as the contracts stand, and nothing more is charged than was specifically agreed upon, I can discern no cause of action.

Furthermore, if plaintiff has any cause of action at all, it is, I think, one at law to recover damages, and not in equity, for an accounting. Although defendant's compensation for the services he rendered was

to be measured by a percentage of the profits realized, that compensation was distinctly stated to be intended "as a commission." Plaintiff's services with regard to a sale of defendant's property was of the same nature.

On both grounds, therefore, I think that the judgment was right, and should be affirmed.